FILED
Jun 24, 2026
10:04 AM(CT)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | |
|---|---|
| **Chad Primm,**<br> **Employee,**<br> **v.**<br>**Central Sales & Service, Inc.,**<br> **Employer,**<br>**Auto-Owners Ins. Co.,**<br> **Carrier,**<br>**And**<br>**Troy Haley, Administrator,**<br>**Subsequent Injury and Vocational**<br>**Recovery Fund.** | **Docket No. 2025-60-3209**<br><br><br>**State File No. 3061-2025**<br><br><br>**Judge Kenneth M. Switzer** |

---

## COMPENSATION ORDER GRANTING BENEFITS

---

In this accepted claim, the principal issue is the extent of Chad Primm's permanent impairment from a low-back injury he suffered while lifting a heavy object for Central Sales & Service on January 6, 2025.

The parties clash on the correct impairment rating. Mr. Primm contended he is entitled to permanent total disability or at least 12% with a future claim for extraordinary benefits. Central Sales argued that Mr. Primm is only entitled to an original award of 7% permanent partial disability. The Subsequent Injury and Vocational Recovery Fund denied any liability.

Mr. Primm and Central Sales also disputed whether Mr. Primm is entitled to past temporary disability and the circumstances of him leaving his employment.

After a compensation hearing on June 3, 2026, the Court finds that Mr. Primm is not permanently and totally disabled, retained a 7% permanent partial impairment, and is entitled to past temporary disability benefits from Central Sales. The Fund has no liability.

# Claim History

## *Mr. Primm's testimony*

Mr. Primm, age 51, recalled that on the date of the work incident, he picked up a steel slab. As he turned, "It felt like somebody stabbed me in my lower back[.]" A year and a half later, he said his condition is worsening not improving.

Mr. Primm has not worked since the injury due to severe daily back pain and numbness in both legs. The pain interferes with his sleep and prevents him from doing chores around the house or pursuing his former hobbies. Prescribed medications, physical therapy, and injections have brought little or no relief.

In addition to pain, Mr. Primm described other physical limitations that prevent him from working. Sitting for longer than half an hour at a time is difficult. Bending over to retrieve an object is also challenging. He cannot stand for long periods of time, lift, or twist. He can drive but must take frequent breaks.

As for his education and work history, Mr. Primm has a high school diploma and attended college for "half a semester." His first jobs were mostly as a laborer until he started working in industrial maintenance, which he has done for well over a decade and was his field at Central Sales. At the time of his injury, he was a production supervisor in the cleat department. Mr. Primm directed the work of three other "operators" but also performed the same work alongside them.

Their workdays consisted of using water jets to cut rubber cleats and then boxing and loading them on pallets. They also cut and lifted extrusion dies, which are half-inch steel plates weighing anywhere from 80 to 100 pounds. The job was fast-paced and involved constant lifting, and he was on his feet for most of his workdays. His position also occasionally required reading and revising blueprints, but Mr. Primm said he could not create them himself. He has a welding certificate.

Mr. Primm said he had no previous back injuries or workers' compensation claims. This statement was contradicted somewhat by medical records from before the injury. In 2020, he had a cyst at the bottom of his spine that was lanced, and on cross-examination by Central Sales, he agreed that in 2017 he was treated for a boil on his back. He further acknowledged that a medical record from that same year stated that he was seen for "workers' comp and knee pain." But on questioning by the Fund, Mr. Primm could not recall filing a claim, receiving significant treatment

or an impairment rating, or settling. He maintained he had no previous disabilities or restrictions before January 6, 2025.

Central Sales vigorously cross-examined Mr. Primm, questioning his credibility on numerous other matters. For example, he acknowledged using a product known as kratom frequently while working for "energy."

In addition, Mr. Primm said on cross that he started a business called Primm Powder Coating in October 2024. This short-term business consisted of powder coating auto parts to make the parts more durable. Mr. Primm learned the process by watching online videos. He stopped after the injury because he could no longer do the work.

Mr. Primm acknowledged a few incomplete or inaccurate responses to discovery relating to his business. When confronted with bank statements showing minimal deposits related to Primm Powder Coating, he clarified that all work was done before the work injury. He similarly did not produce the requested copies of photos or videos of work performed for the business, and he answered "none" to a request asking for copies of correspondence with customers. Mr. Primm said any photos, videos, or emails were deleted. He further said that a post-injury social media ad for the business was intended for his son to do the work. But, his son eventually took another job, and the post should have been taken down.

*Treatment*

Mr. Primm went to the emergency room two days after the accident. Afterward, Central Sales gave a panel, and he chose an orthopedic specialty clinic. He saw a physician assistant two weeks later. She ordered an MRI and physical therapy and placed work restrictions. A month later, the physician assistant ordered additional physical therapy and an injection, and she kept restrictions in place. Then, in March, another physician assistant referred Mr. Primm to a spine specialist and took him off work for eight days.

Mr. Primm saw authorized physician Dr. Scott Standard in late July, who recorded the failure of conservative treatment and diagnosed a herniated disc at L5-S1. He recommended another injection but wrote that if it failed to bring relief, surgery would be necessary.

At the next visit on September 3, Dr. Standard noted improvement in Mr. Primm's pain level and he was "not needing surgical management at this time." Mr. Primm said that the doctor examined him for about five minutes. Dr. Standard assigned maximum medical improvement, a 12% impairment, and a permanent restriction of no lifting more than 35 pounds. He released Mr. Primm from treatment.

Approximately two months later, Mr. Primm attended an employer's examination with Dr. John Brophy. In the review of symptoms, Mr. Primm confirmed back pain radiating down both legs but denied "muscle weakness" and "neurologic weakness." Dr. Brophy assigned a 7% impairment but placed no restrictions. Notes from the exam stated that they discussed "the possibility of improvement in the disc herniation over time and the option of returning to an alternative career requiring less heavy lifting."

*Expert proof*

Dr. Standard testified that, at the first office visit, Mr. Primm was "obviously in a significant amount of pain." He performed a physical exam lasting approximately five minutes. He reviewed the MRI film and diagnosed degenerative disc disease in the lumbar spine and a disc herniation on the left at L5-S1. Mr. Primm had radiculopathy at that visit, as well as pain when sitting, standing, "or lifting anything significant."

After another injection and more physical therapy, Mr. Primm reported a pain level of 2/10 at the second and final visit. Dr. Standard performed a "superficial exam" on that date but did not record that in the records. He placed a permanent 35-pound lifting restriction because it is "standard" and within the "medium demand category." As for limits on sitting or standing, Dr. Standard placed no restriction but said Mr. Primm should "self-manage." He believed Mr. Primm's standing ability should improve over time.

Dr. Standard explained how he arrived at his rating. He used the AMA Guides, table 17-4 on page 570. He placed Mr. Primm in "Class 2, which is intervertebral disc herniation at a single level, medically documented findings, with or without surgery, and documented radiculopathy at the clinically appropriate level at the time of the examination." He added that Class 1 is inappropriate "[b]ecause he had radiculopathy and a herniated disc." On cross, Dr. Standard said that at the

second visit, he did not record numbness—just at the initial exam—but he said Mr. Primm had numbness at maximum medical improvement.

Dr. Standard testified that Mr. Primm was unable to return to the same type of work he did before the injury. On cross, he clarified that he was not saying that Mr. Primm "couldn't go back to work."

For his part, Dr. Brophy testified he is a member of the Bureau's Certified Physician Program and the Workers' Compensation Medical Advisory Committee. He, too, reviewed the actual imaging and Dr. Standard's records.

Dr. Brophy performed a 20-minute examination to include strength-testing in both extremities, sensory touch, and deep tendon reflexes. Dr. Brophy agreed with Dr. Standard's diagnosis that Mr. Primm had an S1 radiculopathy, secondary left L5-S1 herniated disc.

Dr. Brophy placed a 7% rating using the Guides, table 17.4, Class 1. He chose Class 1 because "transitioning from class I to class II, it has to be something objective about the radiculopathy and that means weakness. Nobody ever documents weakness, so he remains class I, which is 7 percent."

On cross, Dr. Brophy said that weakness is not the only criterion for a clinical diagnosis of radiculopathy, but it is necessary for transitioning from Class 1 to Class 2. He reiterated, "[W]eakness is necessary to qualify for class II. Otherwise, it's arbitrary." He added, "You can have a horrible radiculopathy with incapacitating pain and a huge ruptured disk and not have weakness."

On redirect, the following exchange occurred while reviewing the applicable table on page 570:

Q: Can you just expand upon why you did not move it into the class II seeing this?
A: Well, documented residual radiculopathy to me requires something objective, meaning weakness, not just having leg pain, so then you go to 12 percent. That doesn't make sense to me.
Q: So, would you consider leg pain to be a non-verifiable radicular complaint?
A: Yes.

Dr. Brophy placed no work restrictions, stating that Mr. Primm "has no neurologic deficit and he was in no significant pain at this time." He explained: "I think generally speaking . . . there has to be some reason other than subjective pain to justify a permanent restriction, and, potentially make someone unemployable." Dr. Brophy additionally disagreed that Mr. Primm cannot return to his pre-injury occupation, saying that Dr. Standard considered Mr. Primm's "subjective pain."

*The termination*

Mr. Primm described his pre-injury job performance as "excellent." He recalled the cleat department breaking production records, and at one point, they were three or four weeks ahead on their orders. After the injury, Central Sales offered light-duty as ordered by the physician assistant, but he still had difficulty meeting the job demands and had to sit often due to pain.

Mr. Primm said that Daniel Deaver, Central Sales' (now) president, terminated him on February 21, 2025, due to poor job performance and attendance. He said his absences were due to medical appointments and physical therapy for the injury. Mr. Primm was upset about his termination, but now he understands the decision. "I just couldn't do the job," he said, noting the time-sensitivity of the work. He denied that at a lunch meeting a few months before the injury, two supervisors discussed with him their concerns about his job performance. No one ever relayed concerns about production in the cleat department, and in fact, Mr. Deaver praised his work.

Mr. Deaver testified that the termination was justified. He explained that Mr. Primm started in a different department, extrusion. Mr. Deaver said that while Mr. Primm was in that position, he heard "reports that there were some issues with his job performance and attendance[.]" While Mr. Primm worked night shifts, Mr. Deaver "heard reports that he was going out to his car a lot at night—things like that. I don't have any specifics, any proof of that—those were just the things that I heard." He said the plant manager in extrusion said he "can't trust him to be over here," so they moved Mr. Primm to the cleat department instead of letting him go.

As for his job performance there, Mr. Deaver said that early on, the company had "issues" with meeting the production schedule. He had concerns about Mr. Primm's organizational skills, noting, "We felt like he wasn't using his time wisely." He also said the employees Mr. Primm supervised "seemed a little bit disgruntled. They complained a lot about working for him, that he wasn't setting them up for success a lot." Mr. Deaver said he saw Mr. Primm on his phone or "just hanging out

by the water jets." He said "a couple times" the company talked to Mr. Primm about their concerns. Further, "I saw multiple instances where it looked like he was just watching videos on his phone."

Mr. Deaver agreed that the company provided light duty after the accident but said Mr. Primm should have been able to do the accommodated work. Devices or coworkers could have helped him with lifting. As to Mr. Primm's job performance, he "couldn't see an appreciable difference from before the injury to after the injury." Mr. Deaver said that the company has sitting-only positions in other divisions, such as the sewing department.

Mr. Deaver did not "take issue with" excused absences for doctor or therapy visits, but he said that Mr. Primm had "sort of a bad attendance record as well, coming in late, asking if he could leave a few minutes early for this or that." Mr. Deaver stated that some of these instances were recorded, but he offered no documentation. Discussions took place about terminating Mr. Primm before the injury, but Mr. Deaver did not say who participated in them, when, or how often they occurred. He said two other supervisors went to lunch with Mr. Primm before the injury to discuss their concerns. Mr. Deaver did not attend that lunch.

On cross-examination, Mr. Deaver agreed that Central Sales produced Mr. Primm's personnel records, and they contained "no negative reports." He could not recall praising Mr. Primm because the cleat department output was increased; he said the increase overall was due to work in different departments.

## Findings of Fact and Conclusions of Law

Mr. Primm has the burden of proof on all essential elements of his claim and must show by a preponderance of the evidence that he is entitled to the requested benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2025); *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015).

### *Permanent total disability*

To prevail on this claim, Mr. Primm must show that he is "totally incapacitated from working at an occupation that brings [him] an income," meaning he is unable to work at any job in the open labor market. Tenn. Code Ann. § 50-6-207(4)(B); *Duignan v. Stowers Mach. Corp.,* No. E2018-01120-SC-R3-WC, 2019 Tenn. LEXIS 224, at *21 (Tenn. Workers' Comp. Panel June 19, 2019).

The permanent and total disability assessment is based upon numerous factors, including the employee's skills and training, education, age, local job opportunities, and capacity to work at the kinds of employment available in his disabled condition. *Id.* at *21-22. Although a rating of anatomical disability by a medical expert is also one of the relevant factors, "the vocational disability is not restricted to the precise estimate of anatomical disability made by a medical witness." *Henson v. City of Lawrenceburg,* 851 S.W.2d 809, 812 (Tenn. 1993). In addition, the employee's own "assessment of his physical condition and resulting disabilities is competent testimony and cannot be disregarded[.]" *Duignan,* 2019 Tenn. LEXIS 224 at *22.

Considering the above, Mr. Primm has experience in industrial maintenance, supervising employees, and reading and changing blueprints occasionally. He also has a welding certificate. He has shown an entrepreneurial ability, started Primm Powder Coatings, and provided a service for which he is self-taught. Mr. Primm has a high school education and "some college." He was articulate in his testimony. He is 51 years old. Notably, both doctors believed Mr. Primm is capable of some work.

This all weighs against a finding that he is permanently and totally disabled. Moreover, Mr. Primm gave no proof on local job opportunities or his capacity to work at the kinds of employment available.

Mr. Primm credibly testified that he suffers daily, severe, and disabling back pain and leg numbness. Despite Central Sales' extensive efforts to attack his credibility, the Court affords little weight to its cross-examination. To the extent that Mr. Primm gave incomplete responses to written discovery, the Court frowns upon that. However, Mr. Primm adequately explained most of the discrepancies Central Sales identified. In addition, "if minor and insignificant details vary, an injured worker should not be penalized simply for being a poor historian." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 677 (Tenn. 1991).

The Court credits Mr. Primm's description of how the injury affected his ability to work and daily life. He said that driving, sitting, or standing for long periods is difficult, and he cannot twist. But Dr. Standard did not place restrictions reflecting these limitations, while Dr. Brophy placed no restrictions at all.

Considering the proof, the Court cannot conclude that Mr. Primm has shown by a preponderance of the evidence that he is permanently and totally disabled. That claim is denied.

Therefore, the Fund has no liability.  *See* Tenn. Code Ann. § 50-6-208(a)(1) (Fund's liability requires findings of permanent total disability and that the employee "previously sustained a permanent physical disability.").

*Original award*

Given the above ruling, the Court must determine Mr. Primm's original award under section 50-6-207(3)(A).  Dr. Standard's 12% rating is presumed accurate but may be rebutted by a preponderance of the evidence.  *Id.* § 50-6-204(k)(7).  Central Sales contended that Dr. Brophy's 7% rating rebuts the presumption.

When presented with competing expert opinions, the Court can consider their qualifications, the circumstances of their examinations, the information available to them, and the importance attached to the information by other experts.  *Orman,* 803 S.W.2d at 676.

Here, both physicians are well-qualified neurosurgeons.  Dr. Brophy has undergone additional training with the Bureau.  This factor favors him slightly.  Both physicians viewed the actual films from the imaging.  Dr. Standard's notes suggest he read records of previous authorized treatment at the first visit, and Dr. Brophy reviewed them before the employer's exam and his deposition.  This factor favors neither physician. Dr. Standard treated Mr. Primm twice, while Dr. Brophy saw him once for an opinion for litigation.  This factor favors Dr. Standard only slightly.

The importance attached to the information they considered is what differentiates their opinions.

Dr. Standard placed Mr. Primm in Class 2.  The Guides on page 570 state in part that Class 2 requires "documented residual radiculopathy at the clinically appropriate level present at the time of examination."  Looking at Dr. Standard's September 3 notes, as Central Sales stated, no physical exam is documented.  Mr. Primm recalled a brief, five-minute exam, and when pressed on this point at his deposition, Dr. Standard called it a "superficial exam."  Importantly, Dr. Standard's notes do not mention "documented" residual radiculopathy or verified weakness. Rather, Dr. Standard recalled that Mr. Primm had "numbness" at the first exam. Overall, the notes from the visit where he assigned the rating are cursory at best.

In contrast, Dr. Brophy performed a 20-minute examination and concluded that Mr. Primm should be considered as Class 1. In part, this requires "nonverifiable radicular complaints at clinically appropriate level(s), present at the time of examination." In other words, Mr. Primm did not report any muscular or neurological weakness. Dr. Brophy testified—repeatedly—that Mr. Primm's pain is a nonverifiable radicular complaint.

The Court finds Dr. Brophy gave the more plausible and detailed explanation for his rating, so Central Sales has rebutted by a preponderance of the evidence the presumption attached to Dr. Standard's rating. Mr. Primm retains a 7% medical impairment, entitling him to an original award of $15,303.02.

*Temporary partial disability*

Temporary partial disability refers to the time during which the injured employee can resume some gainful employment but has not reached maximum recovery. *Mace v. Express Servs., Inc.,* 2015 TN Wrk. Comp. App. Bd. LEXIS 49, at *8 (Dec. 11, 2015).

Central Sales first argued that a physician assistant rather than a physician placed Mr. Primm's restrictions, so the restrictions need not be honored. The Court disagrees.

Tennessee Compilation Rules and Regulations 0800-02-01.06(7) (2018) permits physician assistants under the supervision of a licensed physician to provide medical treatment, but only a supervising physician may determine medical causation, a permanent impairment rating, and the date of maximum medical improvement. Notably absent from this list is placing work restrictions.

Central Sales cited no authority stating that a physician assistant cannot assign restrictions. Further, by Mr. Primm's unrefuted testimony, he saw the physician assistants by choosing them from a panel that Central Sales offered. Mr. Deaver testified that when the physician assistant placed the restrictions, Central Sales honored them. This argument is unavailing.

Next, Central Sales argued that Mr. Primm was terminated for cause. Even though an employee has a work-related injury for which temporary benefits are payable, an employer may still enforce workplace rules. *Mace,* 2015 TN Wrk. Comp. App. Bd. LEXIS 49 at *8. Further, "[a]n employer will not be penalized for

10

enforcing a policy if the court determines (1) that the actions allegedly precipitating the employee's dismissal qualified as misconduct under established or ordinary workplace rules and/or expectations; and (2) that those actions were, as a factual matter, the true motivation for the dismissal." *Id.* at *9.

Mr. Deaver testified that Central Sales terminated Mr. Primm mostly due to concerns about how Mr. Primm used his time and the cleat department's resulting production levels. Meeting production is an ordinary workplace rule or expectation. But Mr. Deaver's vague testimony, rife with hearsay, was unpersuasive.

For example, pre-injury, Mr. Deaver said the extrusion manager told him he could not trust Mr. Primm. Further, while in extrusion, Mr. Deaver "heard reports" that Mr. Primm left the workplace excessively to go to his vehicle. He acknowledged, however, that he had no "specifics" or "proof" about this. Both instances are hearsay, and the Court gives them little weight.

Once Mr. Primm was moved to the cleat department, Mr. Deaver said the employees he supervised complained. This is also hearsay. Mr. Deaver saw Mr. Primm on his phone, watching a video and/or "hanging out" by the water jets. But again, the details are lacking. Further, Mr. Deaver did not attend the lunch where supervisors supposedly conveyed their concerns to Mr. Primm, so he has no actual knowledge of what was discussed.

Mr. Deaver said that sitting-only positions were available at Central Sales. But when concerns apparently arose, Central Sales did not offer Mr. Primm a different, sitting-only position. They terminated him.

An employer need not offer written documentation to prove a rule's existence. *Womble v. Uncle Dave's Auto Repair, Inc.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 61, at *8 (Dec. 10, 2018). Still, Central Sales offered no evidence to corroborate Mr. Deaver's testimony. It introduced no paperwork about its workplace rules and expectations, or its efforts to coach, warn, or discipline Mr. Primm when concerns about his job performance arose before the injury. Mr. Primm's personnel file exists; it contains nothing negative.

In contrast, Mr. Primm credibly testified to the quality of his work, pre- and post-injury. He recalled the lunch but said the conversation focused solely on meeting the demands of upcoming work. Mr. Primm emphatically denied that his supervisors questioned his production levels. He said the department set production records and was at times weeks ahead of schedule. Arguably, Mr. Primm offered

little detail and no documentation to support his testimony, either. But Mr. Primm also candidly admitted that he just could not do the job after the injury. His testimony was sincere.

Under these circumstances, the Court cannot find that Mr. Primm engaged in "misconduct under established or ordinary workplace rules and/or expectations." Nor can the Court find that his actions were, as a factual matter, the true motivation for his dismissal.

Rather, Mr. Primm acknowledged that post-injury, he did not meet the physical demands of his job. The Court finds that he could not do so due to the work injury. His inability to meet production from the work injury was Central Sales' true motivation for letting him go.

Therefore, Mr. Primm has shown by a preponderance of the evidence that he is entitled to temporary partial disability benefits from February 22 through September 3 in the amount of $13,463.87.

*Costs*

Mr. Primm requested the following discretionary costs: Bertram Reporting, Dr. Standard's deposition, $662.80; Lexitas Court Reporting, $525.50; Dr. Brophy's Deposition, $750.00; and Veritext Corporate Services, LLC, Mr. Primm's deposition, $469.50. Central Sales countered that if the Court awards permanent partial disability benefits based on Dr. Brophy's 7% impairment rating, the discretionary costs should be limited to the $469.50 incurred for the transcript from Mr. Primm's deposition.

Subsection 50-6-239(c)(8) permits a workers' compensation judge to "assess discretionary costs including reasonable fees for depositions of medical experts against the employer." Further, as Central Sales argued, the Appeals Board reduced an award of costs "incurred in the pursuit of permanent total disability benefits," which claim was unsuccessful. *Oldham v. Freeman Webb Co. Realtors,* 2024 TN Wrk. Comp. App. Bd. LEXIS 37, at *42 n.9 (Nov. 8, 2024).

Mr. Primm's claims for permanent total disability or 12% permanent partial disability were unsuccessful. So, costs for Dr. Standard's deposition are not available. However, the remainder of the requested costs, $995.00, is reasonable and awarded to him.

**IT IS, THEREFORE, ORDERED as follows:**

1.  The Subsequent Injury and Vocational Recovery Fund is dismissed from this case with prejudice.

2.  Central Sales shall pay Mr. Primm permanent partial disability benefits of $15,303.02. Mr. Primm may file another petition seeking increased permanent partial disability under section 50-6-207(B).

3.  Central Sales shall pay Mr. Primm $13,463.87 in a lump-sum as past temporary disability benefits.

4.  Central Sales shall furnish reasonable, necessary, and work-related future medical benefits with Dr. Standard under section 50-6-204.

5.  Mr. Primm's counsel is entitled to attorney fees of 20% of his past disability and original awards.

6.  Central Sales shall pay Mr. Primm's discretionary costs of $995.00.

7.  The Court taxes the $150.00 filing fee to Central Sales, to be paid to the Court Clerk under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (2026) within five business days, and for which execution might issue.

8.  Central Sales shall file a Statistical Data Form (SD-2) with the Court Clerk within ten days of the date this order becomes final.

9.  Unless appealed, this order becomes final 30 days after entry.

**ENTERED June 24, 2026.**

_Kenneth M. Switzer_
**JUDGE KENNETH M. SWITZER**
**Court of Workers' Compensation Claims**

## APPENDIX

**Exhibits:**
1. Deposition of Dr. Scott Standard with exhibits
2. Deposition of Dr. John Brophy with exhibits, and videotape
3. Joint Medical Records for Compensation Hearing
4. Affidavit for Attorney Fee of Charles L. Hicks
5. Bank statements, December 31, 2024, February 28, 2025
6. Answers to Requests for Admissions, p. 1
7. Answers to Request for Production, p. 4
8. Answers to Interrogatories, p. 3
9. Mr. Primm's Facebook post, April 8, 2025
10. Google review of Primm Powder Coating by Terry LeFrain
11. Mr. Primm's Facebook post, March 24, 2026
12. Mr. Primm's Facebook post (late-filed), April 17, 2026
13. Mileage reimbursement, May 15, 2026
14. Three Rivers Hospital record, October 21, 2017
15. Dickson Medical Associates record, February 23, 2017
16. Cleat Department Supervisor job description
17. Excerpts from the AMA Guides

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on June 24, 2026.

| Name | Email | Sent to |
|---|---|---|
| Larry Hicks, employee's attorney | X | Office@hickslawfirm.com |
| Ben Norris, employer's attorney | X | Bnorris@eraclides.com |
| Laurenn Disspayne, SIF attorney | X | Laurenn.Disspayne@tn.gov |

_____

Penny Shrum
Clerk, Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board.  To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
   ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
   ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.

   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal.  Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service.  In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee.  You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal.  **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal.  If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee.  If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk.  The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted.  For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable.  See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____       ☐ Motion Order filed on _____

☐ Compensation Order filed on_____       ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

### Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*